SPRING COAL COMPANY & others *vs.* BETHLEHEM STEEL COMPANY.

Suffolk.     October 19, 1921. — November 23, 1921.

Present: RUGG, C. J., CROSBY, PIERCE, CARROLL, & JENNEY, JJ.

*Sale,* What constitutes.     *Contract,* Construction.     *Words,* "Sold and delivered."

In sales of personal property the words "sold and delivered" indicate a point of time in an agreement for sale when all things to be done under the agreement relative to the passing of title have been done and title to and possession of the property have been transferred and passed over to the purchaser.

A provision of a contract in writing for the sale of coal in 1918 relating to the price of $4.68 per gross ton f. o. b. a certain shipping port in Virginia, was as follows: "This price is based on $2.75 net ton f. o. b. mines and is subject to any advance permitted by United States Government for commercial coal from New River district. Should the United States Government remove price restrictions the balance due on this contract is automatically cancelled thirty days thereafter." While the contract was in force, the United States Fuel Administrator, under the authority of 40 U. S. Sts. at Large, 284, issued an order on December 13, 1917, in substance providing that "the maximum price of coal sold and delivered to vessels for foreign bunkering purposes or for export to foreign countries . . . shall be the price prescribed . . . plus $1.35 per ton of 2,000 pounds;" and on February 25, 1918, he issued a further order, confirming the quoted provision of the order of December 13 and defining that order in some particulars, among others that "no coal can be invoiced at the excess prices provided in this order except by the operator or dealer who actually loads it into foreign vessels and only after the coal has been so loaded." In January, February and March, 1918, the seller delivered coal under the contract at the designated Virginia port, subject to the order of the defendant or his agents, not knowing that it was to be exported or used for foreign bunkering purposes by the purchaser. The purchaser so used it, and had intended to do so for some days before the delivery.

Having received payment at $4.68 per gross ton, the seller, upon learning the use for which the coal had been bought, brought an action for an additional $1.24 per gross ton, relying on the order of the Fuel Administrator of December 13, 1917. *Held,* that

(1) The coal was sold and delivered to the defendant as the final steps in the performance of the written agreement of sale between the parties when it was delivered f. o. b. at the Virginia port subject to the order of the defendant or of his agents;

(2) In order to be entitled to the increased price authorized by the order of the Fuel Administrator of December 13, 1917, the plaintiff must prove that it was the intent of the parties to the agreement of sale as shown by acts, declarations or conduct when the contract was made and executed, or when the coal was sold and delivered and the sale became a perfected and accomplished fact, that the coal was "sold and delivered to vessels for foreign bunkering purposes or for export to foreign countries, except to Canada and Mexico;"

(3) Such intent on the part of the plaintiff must be shown by him to have existed in his mind not later than the time when he by his final act sold and delivered the coal;

(4) Such intent on the part of the plaintiff cannot be established by proof of an absence of intent or of knowledge as to the use to which the defendant intended to put the coal.

As to contentions of the plaintiff in the action above described that the contract which was the basis of the action was a contract for export within the meaning of the order notwithstanding the fact that the contract referred to shipment to the designated Virginia port; and that, if not such in origin, it "was subsequently modified so as to make it a contract of the sort above referred to" by the acts of the parties to it, it was *held,* that the contract was not a contract for export within the meaning of the order of the Fuel Administrator of December 13, 1917, and that, upon the evidence, it could not be found to have been modified or changed into a contract for export.

CONTRACT for $25,488.20 and interest, alleged to be a balance due on account of the purchase price of coal sold and delivered to the defendant under the provisions of a contract in writing described in the opinion. Writ dated May 15, 1919.

Spring Coal Company was originally the only plaintiff. By amendment, Long Branch Coal Company and Willis Branch Coal Company, corporations which also had signed the contract in writing which was the foundation of the action, were joined as plaintiffs in the circumstances described in the opinion.

In the Superior Court, the action was heard by *Keating,* J., without a jury.

The order of the United States Fuel Administrator of December 13, 1917, was entitled, "Order Relative to Prices for Coal for Foreign Bunkering Purposes and Export Cargoes," and was as follows:

"The United States Fuel Administrator, acting under authority of an Executive Order of the President of the United States dated 23 August 1917, appointing said administrator, and in furtherance of the purpose of said order and of the Act of Congress therein referred to and approved August 10, 1917,

"Hereby orders and directs that, until further or other order of the United States Fuel Administrator, the maximum price of coal sold and delivered to vessels for foreign bunkering purposes or for export to foreign countries, except to Canada and Mexico, shall be the price prescribed for such coal at the mine at the time such coal left the mine plus transportation charges from the mine to port of loading plus $1.35 per ton of 2,000 pounds. To this price, computed as above, the seller of the coal, or such other agency as performs the actual work of bunkering or loading the vessel, may add the customary and proper charges, if any, for storage, towing, elevation, trimming, special unloading, and other port charges, and is subject to all present and future regulations of the United States Government.

"Nothing in this order shall be construed to affect or modify any of the regulations of the War Trade Board regarding coal for export or bunkering."

On February 25, 1918, the Fuel Administrator issued an order entitled, "Amendment to the Order of the United States Fuel Administrator dated December 13, 1917, entitled 'Relative to Prices for Coal for Foreign Bunkering Purposes and Export Cargoes,' " which read as follows:

"The United States Fuel Administrator, acting under authority of an Executive Order of the President of the United States dated 23 August, 1917, appointing said administrator, and in furtherance of the purpose of said order and of the Act of Congress therein referred to and approved August 10, 1917,

"Hereby orders and directs that the order of the United States Fuel Administrator dated December 13, 1917, and entitled 'Relative to Prices for Coal for Foreign Bunkering Purposes and Export Cargoes,' is hereby amended to read as follows:

"1. Until further or other order of the United States Fuel Administrator, the maximum price of coal sold and delivered for export to foreign countries, excepting Canada and Mexico, or to vessels for foreign bunkering purposes, shall be the price pre-

scribed for such coal at the mine at the time such coal left the mine, plus transportation charges from the mine to port of loading, plus $1.35 per ton of 2,000 pounds.   To this price, computed as above, the seller of the coal, or such other agency as performs the actual work of bunkering or loading the vessel may add the customary and proper charges, if any, for storage, towing, elevation, trimming, special unloading, and other port charges and is subject to all present and future regulations of the United States Government.

"2. No coal can be invoiced at the excess prices provided in this order except by the operator or dealer who actually loads it into foreign vessels and only after the coal has been so loaded.

"3. After, and only after, such excess price has been collected in accordance with paragraph 2, all or such part of it as has been agreed upon beforehand may be paid to the dealer or dealers from or through whom the coal was obtained.

"4. In settling the price of coal for foreign bunkering or export purposes, no jobber's margin or other commission in addition to the $1.35 per ton provided in the order shall be added to the price of the coal.

"5. The phrase 'delivered . . . to vessels for foreign bunkering purposes,' mentioned above, is hereby held to mean coal put in the bunkers of any vessel sailing from a tidewater port for any port outside of the United States and Alaska, excepting naval vessels or Army transports.

"6. Coal shipped to possessions or dependencies of the United States, when consigned to any department of the United States Government, shall not take the excess price provided by this order."

As to each of the shipments by the plaintiff to the defendant, it appeared that the coal "was taken by the defendant to Cuba or used for bunkering purposes on said trip."

Other material evidence is described in the opinion.  The judge found and ruled "that the coal was not sold and delivered for foreign bunkering purposes or for export to foreign countries within the meaning of the orders of December 13, 1917, and February 25, 1918, and therefore" found for the defendant; and at the request of the parties he reported the case for determination by this court, judgment to be entered for the defendant if his finding and ruling were warranted, and, otherwise, as to the respective

items making up the plaintiffs' claims and in certain contingencies, judgment to be entered for the plaintiffs.

*C. F. Lovejoy,* (*C. C. Bucknam* with him,) for the plaintiffs.

*S. C. Rand,* for the defendant.

PIERCE, J. This is an action of contract to recover under the terms of a written contract and the rulings of the United States Fuel Administration certain additional charges on three shipments of coal delivered by the plaintiff to the defendant. The Long Branch Coal Company and the Willis Branch Coal Company, both corporations, were the operators or mine owners from whose mines the coal involved in this action came. By an amendment they were joined with the Spring Coal Company, as plaintiff, to obviate future litigation, and it was agreed that the action should be tried and determined as if the Spring Coal Company were the sole plaintiff.

The Spring Coal Company is a middleman and buys from the mines or operators and receives a commission. It has received the commission of fifteen cents per ton allowed by government regulation, and will hold the additional sum it may recover in this action for the use and benefit of the Long Branch Coal Company and the Willis Branch Coal Company.

In the Superior Court the trial judge heard the case without a jury, found and ruled for the defendant with an alternative finding for the plaintiff, and at the request of the parties reported the case to this court.

The contract was drawn on a printed form of contract of the Bethlehem Steel Company, was numbered X29, was dated November 13, 1917, and was signed by the Spring Coal Company, the Long Branch Coal Company and the Bethlehem Steel Company. By its terms "The Spring Coal Company agrees to sell and Bethlehem Steel Co. of Bethlehem, Pa. agrees to buy" between January 1, 1918, and December 31, 1918, monthly, fifteen thousand tons Long Branch and Willis Branch, Run-of-mine coal at the price of $4.68 gross tons f. o. b. Sewalls Point, Virginia Piers, terms cash, to be shipped to Maryland Steel Plant, Sparrows Point, Maryland, via Virginian Railway. "Note: This price is based on $2.75 net ton f. o. b. mines and is subject to any advance permitted by United States Government for commercial coal from New River district. Should the United States Government re-

move price restrictions the balance due on this contract is auto-matically cancelled thirty days thereafter." The remaining provisions of the contract are not considered, having no bearing upon the issue in this controversy.

Under the authority of § 25 of the Lever Act, enacted August 10, 1917, c. 53, 40 U. S. Sts. at Large, .284, the President of the United States was authorized to regulate the sale, shipment and distribution of coal and coke among dealers and consumers — domestic or foreign — and to fix the prices upon the basis of the cost of production, including expense of operation and mainte-nance plus a just and reasonable profit.  Under the authority of the act the President, on August 21, 1917, made a proclamation fixing provisionally the price of bituminous coal at the mine in the several coal producing districts of the country.  On August 23, 1917, the President appointed a Fuel Administrator.  The Fuel Administrator, by an order dated October 6, 1917, provided that " 1.  The prices for coal fixed by the President, as modified by the orders of the Fuel Administrator, shall apply to export and bunker coal."  The order also provided that coal could be bought and sold at prices lower than those prescribed.  On No-vember 6, 1917, the Fuel Administrator issued an order requir-ing all shipments of coal to tide water to be delivered through the Tide Water Coal Exchange, an organization at tide water ports for the efficient handling of vessels and cargoes.  The government required all coal shipped from mines to such ports to be consigned in care of this exchange.  The government also classified all coal into pools according to the quality of the coal, these pools being designated and known by numbers.  The cars came to tide water from the mines, the coal was credited to the owner in the proper pool and remained in the cars until dumped into vessels.  When a cargo was to be shipped, the owner of the coal notified the Tide Water Coal Exchange that a vessel would report at a certain time to be loaded with coal credited by the exchange to such owner, and directed the exchange to load the coal from the particular pool in which such owner had the coal credited to him.  Upon the arrival and reporting of the vessel the Tide Water Coal Ex-change would issue orders to the railroad in whose cars the coal was standing, to dump the coal designated into the vessel.  Upon receipt of these orders the railroad would move the cars to the

pier, dump the coal directly into the vessel at the end of the pier, and trim or stow the coal in the vessel. For this dumping and trimming the railroad charged a fee of approximately seven cents per ton, which was paid by the vessel.

The three cargoes in question in the case were carried from the mines to Sewalls Point, Virginia Piers, by the Virginian Railway, consigned to the plaintiff in care of the Tide Water Coal Exchange. The price of the coal, $4.68, fixed in the contract of November 13, 1917, was the maximum price then allowed for bituminous coal for domestic or foreign use by the Fuel Administrator. The price $4.68 was made up or based upon the maximum government price of $2.60 per ton at the mines, plus commission fifteen cents, plus a percentage for long ton, plus a charge of $1.60 for freight to tide water. Before the defendant had ordered or the plaintiff had shipped coal under the contract, the Fuel Administrator on December 13, 1917, issued an order "Relative to prices for coal for foreign bunkering purposes and export cargoes" which reads: "The United States Fuel Administrator . . . Hereby orders and directs that, until further or other order of the United States Fuel Administrator, the maximum price of coal sold and delivered to vessels for foreign bunkering purposes or for export to foreign countries, except to Canada and Mexico, shall be the price prescribed for such coal at the mine at the time such coal left the mine plus transportation charges from the mine to port of loading plus $1.35 per ton of 2,000 pounds. To this price, computed as above, the seller of the coal, or such other agency as performs the actual work of bunkering or loading the vessel, may add the customary and proper charges, if any, for storage, towing, elevation, trimming, special unloading, and other port charges. . . ." Under this order the maximum net increase allowed in the price of coal sold and delivered to a vessel for foreign bunkering purposes or for export to foreign countries was $1.24 per ton. This difference of $1.24 per gross ton is the amount which the plaintiff seeks to recover as an additional charge to the defendant upon every gross ton contained in the three shipments of coal delivered to the defendant.

The steamer Feltore was assigned by the defendant to take the coal which was delivered by the plaintiff, under the contract, at Sewalls Point, Virginia Piers, on January 24, 1918, and on Feb-

ruary 20, 1918. The steamer Santore was assigned by the defendant and received the coal which the plaintiff delivered, under the contract, at Sewalls Point, on March 6, 1918. In each delivery the coal was dumped on board the steamer which reported at the pier, by the Virginian Railway, by order of the Tide Water Coal Exchange issued to the railway company upon a notification from the plaintiff to release the coal for specific boats. In directing the release of coal, in each instance the plaintiff instructed the Tide Water Coal Exchange to "Consign to the Bethlehem Steel Company as they may direct" or "as the agent of the Bethlehem Steel Company may direct."

Under date of January 24, 1918, an employee in the office of the plaintiff, presumably upon his own knowledge but without the actual knowledge of the plaintiff that the defendant intended to send the coal delivered at Sewalls Point on that date directly to Cuba without consignment to and reconsignment at Sparrows Point to Cuba, issued an invoice to the defendant of the delivered coal, which invoice bore the typewritten words "Foreign Export." It was not customary to issue bills of lading for steamers by the Tide Water Coal Exchange. On the same day, January 24, 1918, the defendant wrote the plaintiff a letter in which the following statement appears: "It has been impossible since before Christmas for us to move any barges through from Hampton Roads to Sparrow's Point. We have 20 or 25 loaded barges now tied up in the Bay. In order to keep our Sparrow's Point Plant going, we have had to assign our large ore Steamships (the Cubore & Feltore) to carry coal from Hampton Roads, and understand that you are now completing the loading of the Feltore." The defendant admitted at the hearing that it intended to send the steamships direct to Cuba when it wrote the letter which contains the above statement and that it had such purpose for two or three days before that time.

Not essentially dissimilar circumstances attended the deliveries of the plaintiff to the defendant on February 20, 1918, and on March 6, 1918.

While the bilateral agreement of November 13, 1917, for the sale, delivery and acceptance of coal in accordance with its terms during the year 1918, by its terms and by inference had as its object the purchase and sale of coal for domestic purposes, nevertheless, as the maximum price to be received and paid was the

maximum price of both domestic and foreign coal, which maximum price the Fuel Administrator by his order of October 6, 1917, then in force, had fixed for the purpose of regulating the sale, shipment, distribution and storage of coal among dealers and consumers, domestic and foreign, and had further provided that government prices for coal should apply on export and bunker coal and that coal could be bought and sold at prices lower than those prescribed, it could reasonably have been found that the plaintiff and the other parties to the agreement stood indifferent between themselves, as to any disposition which the defendant should choose to make of the coal after it was in fact and law sold and delivered to it f. o. b. Sewalls Point, Virginia Piers.

It would seem to follow as a right under the contract for sale that the plaintiff should be entitled to receive any gain over the contract price, and be required to deduct from that price any loss which followed while the contract remained unperformed as the consequence of any advance in price permitted by the United States government, or of any loss or gain in price upon the removal by the government of price restrictions; and that the right to receive and have distributed as the interest of the parties to the contract might appear would not be affected by a change of the defendant in the final port of discharge, whenever the defendant intended to establish that destination.

The right of the plaintiff, however, rests not upon a permitted increase in price over the contract or upon a removal of price restrictions by the government, but stands upon the order of December 13, 1917, that "the maximum price of coal sold and delivered to vessels for bunkering purposes or for export to foreign countries . . . shall be the price prescribed . . . plus $1.35 per ton of 2,000 pounds."

In sales of personal property the words "sold and delivered" indicate a point of time in an agreement for sale when all things to be done under the agreement have been done, and title to and possession of the property have been transferred and passed over to the purchaser. In the case at bar, the coal in question was sold and delivered to the defendant as the final step in the performance of the contract of November 13, 1917, when it was delivered f. o. b. Sewalls Point, Virginia Piers, subject to the order of the defendant or of its agents.

But the order of the Fuel Administrator does not give a right to charge an increased price of $1.35 per ton upon the mere passage of title and transfer of possession of coal; it conditions the enjoyment of such right upon the fact that the coal was sold and delivered for bunkering purposes or for export to "foreign countries." The fact that the coal was "sold and delivered to vessels for foreign bunkering purposes or for export to foreign countries, except to Canada and Mexico," necessarily can be proved only through proof of the intent of the parties to the agreement of sale as shown by acts, declarations or conduct when the contract was made and executed, or when the coal was sold and delivered and the sale became a perfected and accomplished thing.

It is a fair inference from the order of February 25, 1918, that "no coal can be invoiced at the excess prices provided in this order except by the operator or dealer who actually loads it into foreign vessels and only after the coal has been so loaded," that the intent necessitated by the order of December 13, 1917, was that of the operator or dealer.  However that may be, we think it plain that the intent of the seller as to the use of the coal sold and delivered for such purposes must be shown by him to have existed in his mind not later than the time when he by his final act sold and delivered the coal; and we further think the order is not satisfied by proof of a negative intent, or a knowledge that the buyer intended to put the coal to such uses and purposes.

The plaintiff, in this regard, concedes that the evidence warrants a finding "that the plaintiff did not know that the coal which it was delivering was to be exported" and contends that the right of the seller to recover the excess maximum price allowed for export coal, or any balance unpaid thereof, is dependent not at all upon the mental attitude of the seller when the coal is sold and delivered to the buyer but "solely upon the event" of its being exported in fact.  We cannot agree with this argument and think the right of the plaintiff under the order hangs upon proof that it sold the coal and delivered the coal "to vessels for foreign bunkering purposes or for export."

The plaintiff further contends that the plaintiff's contract was a contract for export within the meaning of the order notwithstanding the fact that the contract "refers to shipment to the Maryland Steel Plant, Sparrows Point, Maryland," and attempts

to support its position by citing the testimony of the purchasing agent of the defendant to the effect that during the years 1916 and 1917 "it was customary for us to place boats with the Spring Coal Company to load on account of this contract and previous contracts for any destination we saw fit." And if not such in origin, it "was subsequently modified so as to make it a contract of the sort above referred to" by the acts of the parties to it. We are of opinion that the contract is not a contract for export within the meaning of the order; and we are of the further opinion that the facts referred to do not sustain the plaintiff's theory that the contract was modified or changed to become a contract for export.

Upon all the issues posited in the plaintiff's brief, we are of opinion that the law and the facts warranted the finding of the trial judge that "the coal was not sold and delivered for foreign bunkering purposes or for export to foreign countries within the meaning of the orders of December 13, 1917, and February 25, 1918."

By the terms of the report, it follows that judgment is to be entered for the defendant.

*So ordered.*